Eric Nelson v. Commissioner.
Nelson v. Commissioner
Docket No. 18710.
United States Tax Court
1949 Tax Ct. Memo LEXIS 45; 8 T.C.M. (CCH) 942; T.C.M. (RIA) 49258; October 18, 1949
*45 William F. Dalton, Esq., City National Bank Bldg., Omaha, Neb., for the petitioner. Elmer L. Corbin, Esq., for the respondent. LEMIRE Memorandum Findings of Fact and Opinion The respondent has determined deficiencies in income tax for 1943 and 1944 in the respective amounts of $2,508.36 and $2,582.79. The issue presented are (1) whether the petitioner and his wife operated a news agency business as partners in 1943 and 1944, and (2) whether the cost of installing certain office improvements in 1944 was a business expense of that year. Findings of Fact The petitioner is a resident of Omaha, Nebraska. He filed individual income tax returns for the taxable years involved with the collector for the district of Nebraska. The petitioner was married to Elizabeth Nelson in 1897. For some time after his marriage he was employed as an elevator operator at the Omaha post office at a salary of $50 per month. His wife did some sewing and took in boarders. They had about $150 each at the time of their marriage. They have always commingled their earnings and kept their funds in "one pocketbook", or a joint bank account. While serving as elevator operator at the post office *46 the petitioner also distributed newspapers in his spare time. The returns from this business were small at first, amounting to less than $5 per week. Later, the petitioner acquired the agency for other periodicals and the business grew to the point where in about 1899 it became necessary for him to give up his job as elevator operator and devote full time to his news agency. The news agency was located in a small office which the petitioner rented for $10 a month. About 1901 the petitioner obtained a contract as distributing agent for the Curtis Publishing Company. This contract required the handling of a large number of copies of the Saturday Evening Post. To handle the increase in business the petitioner had to enlarge his office space and also get additional help. His wife agreed to help with the office work, and did so from about 1906 to 1924. Her principal duties were to hire and instruct the Saturday Evening Post sales boys, distribute their copies to them and keep records of their sales and returned copies. She also took care of the telephone calls, handled invoices and bank deposits, and kept the office records. She spent, on the average, about twenty hours a week at the *47 office. During this period the petitioner devoted most of his time to outside work. Prior to 1926 the petitioner maintained a single bank account in his individual name. This was changed to a joint account for him and his wife in 1926. All of the banking business of the petitioner and his wife was handled through this account. Both of them were authorized to draw, and did draw, on the account. In 1899 the petitioner purchased a lot in Omaha for $275 which was paid out of his and his wife's joint funds. A house was built on the lot at a cost of $1,000 which was also paid out of their common funds. This property was later sold and the money deposited in the joint bank account. Other properties were bought and sold from time to time in a similar manner. In 1931 the petitioner purchased improved real estate known as Carberry Apartments for $110,000, paying $22,500 in cash, from his and his wife's joint account, and another piece of real estate valued at $7,500. Title to the property was taken in the joint names of the petitioner and his wife. The property was placed with a real estate agent for management. The agent was instructed to use the rents, first, to pay off the mortgage *48 of $80,000 and thereafter to pay the net income to petitioner's wife. The mortgage was retired in 1941. The proceeds from the property have since been paid to petitioner's wife and by her deposited in a joint survivorship savings account in the United States National Bank, Omaha, Nebraska. The petitioner and his wife never entered into any written partnership agreement and never obtained a license to do business as a partnership in the State of Nebraska. They did not file a partnership return or report any partnership income in their individual income tax returns. In his returns for the taxable years 1943 and 1944 the petitioner reported income from his business as "News Dealer" in the respective amounts of $19,020.45 and $28,105.44. The only income reported by his wife in those years was the rent from the Carberry Apartments, amounting to $6,925.54 in 1943 and $6,942.18 in 1944. All of the agency contracts under which the petitioner operated were made in his name individually. The petitioner and his wife did not form, or intend to form, a bona fide partnership to operate a news agency prior to or during 1943 and 1944. During 1944 the petitioner made improvements in the office, *49 which he occupied under the lease, at a cost of $976.98. These improvements consisted of wooden bins, or shelves with separate partitions, for storing the magazines and papers which petitioner handled. The improvements were attached to the realty when they were installed and became permanent fixtures, subject to rearrangement from time to time to meet changing business conditions. They had a useful life of several years. Opinion LEMIRE, Judge: The petitioner's claim that he and his wife were partners in the news agency business in 1943 and 1944 was made for the first time in an amended petition filed at the hearing in this proceeding. The deficiencies determined by the respondent are based upon other adjustments, including, in each year, the addition to petitioner's income of one-half of the rentals from the Carberry Apartments. The evidence, we think, fails to establish the existence of a husband and wife partnership. According to the evidence, the petitioner operated the news agency as his own individual business. His wife did render valuable assistance to him in the earlier years from about 1906 to 1924, but she has taken no active part in the business since that time. No *50 partnership agreement was ever entered into and proof is lacking even of an intention on the part of either the petitioner or his wife to form a real business partnership. The evidence as to how or when the alleged partnership was formed is vague and indefinite. When asked by Government counsel how the partnership originated, petitioner's wife replied: "Well, I think we talked it over together; we had no other way of doing it." The petitioner testified that he thought a partnership was formed about 1906, when his wife agreed to help him with the business. The claim that the wife contributed capital to the business is not substantiated. In fact, it does not appear that any capital was ever required in the business. The agency contracts, which were the principal income producing assets, were acquired by the petitioner without cost. On brief, the petitioner relies strongly upon . The cases are distinguishable on their facts. There, as the court found, the wife contributed a substantial amount of capital which was used in the business; she rendered "extensive and important services" to the business from the time of her marriage *51 in 1915 throughout the taxable year 1941; she participated throughout that period in the management and control of the business; she and her husband held themselves out to the bank and others as partners in the business; they filed a partnership income tax return for the taxable year 1941; and, finally, in January 1942, they executed a partnership agreement which the court viewed as "confirmatory of a mutual understanding of a partnership relationship of many years standing". That case differs too widely on its facts to be in any sense controlling in the instant case. We think that evidence is entirely lacking here to meet the tests for family partnerships which the Supreme Court has laid down in ; , and other like cases. The respondent has treated the cost of the improvements which petitioner made to his office in 1944 as a capital expenditure rather than a business expense of that year. These improvements consisted of wooden bins or shelves for storing magazines and other periodicals which the petitioner handled. According to the evidence, they had a useful life of several years. *52 They became a permanent part of the building, which the petitioner occupied under lease, at the time of their installation. The evidence does not show how long the lease had to run or what was the approximate useful life of the bins. We think that the respondent correctly determined that their cost was a capital expenditure. Decision will be entered for the respondent.